# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| YOLANDA DAVIS, TENESHIA BANKSTON, and TIFFANY TAYLOR, *Plaintiffs*, | ) ) ) | |
| v. | ) ) | 3:22-CV-1062 (SVN) |
| DYNATA, LLC, *Defendant.* | ) ) ) | |
| DYNATA, LLC, *Third-Party Plaintiff,* | ) ) ) | September 25, 2023 |
| v. | ) ) | |
| SHIFTSMART, INC., *Third-Party Defendant.* | ) ) ) | |

## JOINT RULING AND ORDER ON THIRD-PARTY DEFENDANT SHIFTSMART, INC.'S MOTION TO STAY AND COMPEL ARBITRATION, PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE, AND DEFENDANT DYNATA, LLC'S MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

In this putative class action brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and state wage and hour laws, named Plaintiffs Yolanda Davis, Teneshia Bankston, and Tiffany Taylor, who worked as call center survey agents ("CCSAs"), seek to recover for pre- and post-shift work time for which they claim Defendant Dynata, LLC, a market research company, did not compensate them. Plaintiffs signed up for shifts to conduct calls for Dynata through an application run by Third-Party Defendant Shiftsmart, Inc.

This ruling addresses three pending motions.  Plaintiffs[1] have moved for conditional certification of a collective action against Dynata under Section 216(b) of the FLSA, ECF No. 42, while Dynata moves to dismiss Plaintiffs' claims for breach of contract and unjust enrichment against it, ECF No. 46.  Additionally, after being sued by Dynata for indemnification, ECF No. 67, Shiftsmart moved to stay this litigation entirely and to compel the named and opt-in Plaintiffs to arbitrate their claims against Dynata, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., and various agreements between Shiftsmart and Plaintiffs.  ECF No. 82.  Dynata seeks to join Shiftsmart's motion and to compel arbitration of the claims pending against it.  ECF No. 88.

The Court provides factual background relevant to all three motions, and then addresses Shiftsmart's motion to compel arbitration, followed by Plaintiffs' motion for conditional certification, and then Dynata's motion to dismiss.  The Court first DENIES Dynata's request to join Shiftsmart's motion to compel arbitration, and GRANTS IN PART and DENIES IN PART Shiftsmart's motion to compel arbitration.  Specifically, Shiftsmart's motion is DENIED with respect to Plaintiffs who agreed to arbitration provisions in place before October 21, 2022, and it is GRANTED with respect to Plaintiffs who agreed to arbitration provisions introduced after that date.[2]  As the Court has granted Shiftsmart's motion to compel arbitration and stay litigation with respect to named Plaintiffs Teneshia Bankston and Tiffany Taylor, the remaining motions proceed with Yolanda Davis as the sole named Plaintiff.

---

[1] Since the filing of the amended complaint, eight opt-in plaintiffs filed notices of consent to join this action:  Tiara Jones, Keshun Durban, Brittni Davis, Margaret Samantha Abernathy, Sasha Watson, Catera Duncan, Toya Shaunnell Keenan, and Alisa Charles.  ECF Nos. 47–49, 56, 63, 73–74.

[2] Specifically, and based on its representations at ECF No. 82-1 at 9, Shiftsmart's motion to compel arbitration is granted with respect to named Plaintiffs Teneshia Bankston, and Tiffany Taylor and opt-in Plaintiffs Sasha Watson, Catera Duncan, Toya Shaunnell Kenan, and Alisa Charles.  It is denied with respect to Named Plaintiff Yolanda Davis and Opt-In Plaintiffs Margaret Samantha Abernathy, Keshun Durden, Brittni Davis, and Tiara Jones.

Next, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion for conditional certification of a collective action under the FLSA. The Court finds that CCSAs who agreed to enforceable arbitration provisions in place on or after October 21, 2022, are not "similarly situated" to the remaining named Plaintiff, Yolanda Davis, for conditional certification purposes. But Plaintiff has otherwise satisfied the requirements for conditional certification, and the Court orders Dynata to identify all potential opt-in plaintiffs. As described further below, the Court orders the parties to submit a revised joint notice by **October 5, 2023**.

Last, the Court DENIES Dynata's motion to dismiss Plaintiff's breach of contract and unjust enrichment claims.

## GENERAL FACTUAL BACKGROUND

This putative class action began on August 23, 2022, when named Plaintiffs Yolanda Davis (of South Carolina) and Teneshia Bankston (of Kentucky) sued Dynata for unpaid wages under Section 216(b) of the FLSA, the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 *et seq.*, the Kentucky Wages and Hours Act, Ky. Rev. Stat. § 337 *et seq.*, and for breach of contract and unjust enrichment. Compl., ECF No. 1. Soon after, named Plaintiff Tiffany Taylor joined Davis and Bankston in the filing of an amended complaint. Am. Compl., ECF No. 32.

Plaintiffs' amended complaint sets forth the following allegations. Dynata is a market research company. ECF No. 32 ¶ 2. In providing market research services to its clients, Dynata administers over-the-phone surveys of members of the public on a wide range of matters. *Id.* ¶ 3. It conducts these surveys with the help of CCSAs. *Id.* ¶ 5. Dynata offers CCSAs "[f]lexible part-time personalize[d] schedules within the copy operating hours." *Id.* ¶ 59. Dynata posts available shifts on the Shiftsmart application, which will be referred to as the Shiftsmart "app" in this ruling. *Id.* ¶ 60. Plaintiffs signed up for shifts through the Shiftsmart app. *Id.*

The CCSAs are "responsible for, among other things:  (a) attending pre-shift meetings to review scripted surveys and instructions for their shifts; (b) running pre-shift systems diagnostic tests; (c) booting up their computers and logging into several essential computer software programs and applications, as well as [Dynata's] phone system, before making survey phone calls; (d) making outbound survey calls to consumers on behalf of [Dynata]; (e) ensuring that every call is properly documented and accounted for in [Dynata]'s system; and (f) logging out of the computer software programs and applications and the phones and shutting down their computers."  *Id.* ¶ 56.

Plaintiffs' amended complaint alleges that Dynata wrongfully failed to pay them for pre-shift work, such as logging into their computers and testing their equipment, and attending pre-shift meetings, and post-shift work, such as shutting down their equipment.  *See*, *e.g.*, *id.* ¶¶ 12, 15, 18, 20–21, 23, 127–39.

## MOTION TO STAY LITIGATION AND COMPEL ARBITRATION

The Court first turns to Shiftsmart's motion to stay litigation and compel arbitration of Plaintiffs' claims against Dynata.  For the reasons explained below, any claims by Plaintiffs who agreed to arbitration provisions in place on or after October 21, 2022, must be pursued in arbitration.

### I.    RELEVANT FACTUAL BACKGROUND

The following facts are relevant to Shiftsmart's motion to compel arbitration.  In December of 2019, Dynata entered into a Master Services Agreement with Shiftsmart, and began conducting telephone surveys with CCSAs soon after.  Zicchino Decl., ECF No. 82-2 ¶¶ 4–5.  To be eligible to work on market research projects for Dynata through the Shiftsmart app, each of the Plaintiffs accepted Shiftsmart's then-current Partner Services Agreement ("PSA"), which defines the terms of the relationship between the CCSAs and Shiftsmart and, in some respects, the terms of the

relationship between CCSAs and Shiftsmart's customers, such as Dynata. *Id.* ¶ 7.  The arbitration provisions at issue were contained within the Shiftsmart PSA.

Shiftsmart's PSA, and the arbitration provisions contained therein, have undergone several changes in recent years.  Relevant here, Shiftsmart introduced a new arbitration provision on October 21, 2022, after the present lawsuit was filed on August 23, 2022.  For ease of reference, the Court will refer to PSAs entered before October 21, 2022, as "pre-litigation PSAs,"[3] and those entered on or after October 21, 2022, as "post-litigation PSAs."[4]  The arbitration provision contained in the pre-litigation PSAs states:

> You agree that THE SOLE AND EXCLUSIVE FORUM AND REMEDY FOR ANY AND ALL DISPUTES AND CLAIMS RELATING IN ANY WAY TO OR ARISING OUT OF THIS AGREEMENT, THE SHIFTSMART PLATFORM AND/OR THE SERVICES PROVIDED (INCLUDING YOUR USE OF AND ACCESS TO THE SHIFTSMART APP AND WEBSITES) SHALL BE FINAL AND BINDING ARBITRATION, . . .

*See, e.g.*, PSA effective Sept. 22, 2021, § 15.2, ECF No. 82-8 at 13.  In addition, the pre-litigation PSAs contain a "no third party beneficiaries" clause, stating that "[t]here are no third party beneficiaries to this Agreement," and that "[n]othing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims."  *See, e.g.*, *id.* at 13, § 14.6.

The arbitration provision in the post-litigation PSAs is more comprehensive than that in the pre-litigation PSAs.  In its preamble, the arbitration provision in the post-litigation PSAs states:

> Please note:  Section 15 of this Agreement contains an Arbitration Provision and Class Action Waiver that applies to you.  This provision applies to any action you bring that arises out of this Agreement, including actions against Shiftsmart or any Affiliate or User in the United States.  It affects how disputes with Shiftsmart are

---

[3] The pre-litigation PSAs bear effective dates of January 23, 2020, ECF No. 82-4; June 26, 2020, ECF No. 82-5; October 21, 2020, ECF No. 82-6; June 30, 2021, ECF No. 82-7; September 22, 2021, ECF No. 82-8; and August 5, 2022, ECF No. 82-9.

[4] The post-litigation PSAs bear effective dates of October 21, 2022, ECF No. 82-10; and December 6, 2022, ECF No. 82-11.

> resolved.  By accepting this Agreement, you agree to be bound by this Arbitration
> Provision and Class Action Waiver.  Please read it carefully.

PSA effective Oct. 21, 2022, ECF No. 82-10 at 2.  An "Affiliate" is defined to include

"Shiftsmart's customers" and "Users of the platform."  *Id.*

Then, Section 15 states, in relevant part, as follows:

> PLEASE READ THIS SECTION 15 CAREFULLY—IT AFFECTS THE
> PARTIES' LEGAL RIGHTS AND GOVERNS HOW YOU AND SHIFTSMART
> CAN BRING CLAIMS AGAINST EACH OTHER.  THIS SECTION 15 WILL,
> WITH LIMITED EXCEPTION, REQUIRE YOU AND SHIFTSMART TO
> SUBMIT CLAIMS ARISING UNDER THIS AGREEMENT, INCLUDING
> CLAIMS AGAINST EACH OTHER, TO BINDING AND FINAL
> ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAITIFF OR
> CLASS MEMBER IN ANY CLASS, COLLECTIVE, GROUP, OR
> REPRESENTATIVE ACTION IN COURT.
>
> THIS MUTUAL AGREEMENT TO ARBITRATE ("ARBITRATION
> PROVISION") IS BETWEEN YOU AND SHIFTSMART.  THE FEDERAL
> ARBITRATION ACT (9 U.S.C. § 1 ET SEQ.) APPLIES TO THIS
> ARBITRATION PROVISION, WHICH EVIDENCES COMMERCE.  THE
> MUTUAL OBLIGATION BY SHIFTSMART AND YOU TO ARBITRATE
> DISPUTES PROVIDE ADEQUATE CONSIDERATION FOR THIS
> PROVISION.  ALL DISPUTES COVERED BY THIS PROVISION WILL BE
> DECIDED BY A SINGLE ARBITRATOR THROUGH FINAL AND BINDING
> ARBITRATION **AND NOT BY WAY OF COURT OR JURY TRIAL**.
>
> **CLAIMS COVERED BY THE ARBITRATION PROVISION:**  This
> Arbitration Provision is intended to be as broad as legally permissible, and, except
> as it otherwise provides, applies to all claims or controversies, past, present, or
> future, that otherwise would be resolved in a court of law or before a forum other
> than arbitration.  Except as it otherwise provides, this Arbitration Provision applies
> to any dispute that Shiftsmart may have against you or that you may have against
> Shiftsmart, and/or any of its or their, past, present, or future: (i) officers, directors,
> shareholders, employees, members, or agents; (ii) Affiliates, parents, and
> subsidiaries; (iii) benefit plans or the plans' sponsors, fiduciaries, administrators,
> affiliates or agents; and (iv) successors or assigns.  Each and all of which the
> individuals and entities listed in (i) - (iv) above may enforce this Agreement as a
> direct or third-party beneficiary.

*Id.* at 15–16, § 15 (emphasis in original).  Section 15 also states that the Arbitration

Provision applies to, among many other types of actions, "claims based upon or related to" "wages,

minimum wage and overtime or other compensation," and claims arising under the FLSA and state statutes "addressing the same or similar subject matters."  *Id.* at 16, § 15.

The arbitration provision in the PSA effective December 6, 2022, is similar in all material respects to that in the October 21, 2022, PSA, except that the sentence "Please read it carefully" at the end of the preamble is in bold font.  *See* PSA effective Dec. 6, 2022, ECF No. 82-11 at 2.

Both the pre-litigation and post-litigation PSAs contain a modification clause which states that "[i]n the event Shiftsmart modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement."  PSAs, ECF Nos. 82-4 through 82-11, § 14.1.  The named Plaintiffs are therefore bound by the last PSA they entered.

## II.    LEGAL STANDARD

The FAA provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The Supreme Court has repeatedly made clear that "the FAA was designed to promote arbitration" and that the act "embod[ies] [a] national policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011) (internal quotation marks omitted) (quoting, in part, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)); *see Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (noting that the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))).  This liberal policy favoring arbitration "is founded upon 'a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their

disputes.'" *Starke*, 913 F.3d at 288 (brackets omitted) (quoting, in part, *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)).

Still, "despite the strong federal policy favoring arbitration, arbitration remains a creature of contract." *Id.* Thus, the FAA "places arbitration agreements upon the same footing as other contracts," but "it does not require parties to arbitrate when they have not agreed to do so." *Schnabel*, 697 F.3d at 118 (internal quotation marks and citations omitted). As a result, "before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017). This question is governed by state law principles of contract formation. *Starke*, 913 F.3d at 288.

"Where a party to an arbitration agreement refuses to comply with that agreement, and instead attempts to proceed in litigation, the other party may move to stay the litigation and compel arbitration." *McCants v. Team Elec., Inc.*, No. 19-CV-9565 (AJN) (RWL), 2021 WL 653122, at *3 (S.D.N.Y. Feb. 19, 2021). In deciding a motion to compel arbitration, the Court's role is limited to determining two issues: first, "whether a valid agreement or obligation to arbitrate exists," and, second, "whether one party to the agreement has failed, neglected or refused to arbitrate." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Jacobs v. U.S.A. Track & Field*, 374 F.3d 85, 88 (2d Cir. 2004)), *cert. denied*, 142 S. Ct. 2889 (2022). "Once a party petitions to compel arbitration, 'the court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.'" *Id.* at 162 (quoting 9 U.S.C. § 4).

In deciding a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment," which requires consideration of "all relevant,

admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned up). The Court must draw all inferences in favor of the non-moving party. *Id.*

### III.      DISCUSSION

#### A.   Whether Dynata May Compel Arbitration

At the outset, the Court rejects Dynata's attempt to join Shiftsmart's motion to compel arbitration. The following chronology is relevant to Dynata's request. On November 30, 2022, Dynata moved to dismiss the breach of contract and unjust enrichment claims in the amended complaint. ECF No. 46. Then, in the parties' Rule 26(f) report filed on December 8, 2022, Dynata represented that it was investigating whether the named Plaintiffs might be bound to arbitrate their claims and that, to the extent the named Plaintiffs were so bound, Dynata intended to move to compel arbitration. ECF No. 53 at 3–4. Dynata proposed that, if it had not filed a motion to compel arbitration by December 22, 2022, discovery could commence in mid-January 2023. *Id.* at 9. Based on this representation, the Court deferred entry of a scheduling order and directed Dynata to file any motion to compel arbitration by December 22, 2022. ECF No. 54. During this time, Dynata informed the court that it was continuing to contemplate whether to file a motion to compel by December 22. *See* ECF No. 55 at 1. It ultimately did not do so. On January 9, 2023, Dynata filed its third-party complaint against Shiftsmart. ECF No. 67.

On May 1, 2013, after being granted extensions to respond to Dynata's third-party complaint, Shiftsmart filed the present motion to compel arbitration and to stay the claims that are subject to arbitration. On May 22, 2023, Dynata filed a response to Shiftsmart's present motion, stating that it "supports and joins Shiftsmart, Inc.'s motion to stay the litigation and compel the

plaintiffs to arbitrate their claims with Dynata." ECF No. 88 at 1. At no time, however, has Dynata has attempted to present good cause to modify the Court's order setting the December 22, 2022, deadline by which it was required to move to compel arbitration. *See* ECF No. 54; *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (discussing the "requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause,'" and noting that "[a] finding of good cause depends on the diligence of the moving party"). At oral argument, Dynata provided additional information about its course of action, claiming that it did not have the information it needed about Shiftsmart's PSAs to move to compel arbitration by the Court's December 22, 2022, deadline. As that rationale for missing the deadline was first provided at the oral argument, however, the Court will not consider it.

Separately, Dynata has also waived its right to seek arbitration. The Second Circuit has previously endorsed a three-factor analysis to determine whether a party has waived its right to compel arbitration: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *McCants*, 2021 WL 653122, at *4 (internal quotation marks omitted) (quoting *Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010)). Although the prejudice element of this test has been called into question by the Supreme Court's recent decision in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022), the other factors weigh in favor of a finding of waiver. Here, nearly nine months passed between the filing of the complaint and Dynata's effort to join Shiftsmart's motion to compel arbitration, and motion practice—including briefing on Dynata's own motion to dismiss—was well underway. "As a general rule, parties cannot participate in the litigation process only to move to compel arbitration when it strategically suits them." *McCants*, 2021 WL 653122, at *4 (quoting

*Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 236 (S.D.N.Y. 2020)). By its conduct, Dynata therefore has waived its right to move to compel arbitration.

Accordingly, the Court denies Dynata's request to join Shiftsmart's motion to compel arbitration as untimely and will not consider whether Dynata has standing to compel arbitration.[5]

## B. Whether Shiftsmart Has Standing to Seek Arbitration

Having found that Dynata may not move to compel arbitration, the Court turns to whether Shiftsmart has standing to compel arbitration. Section 4 of the FAA, in pertinent part, provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Here, Plaintiffs argue that, because they have not asserted any claims against Shiftsmart, Shiftsmart is not an "aggrieved" party within the meaning of Section 4, and therefore does not have standing. For the reasons below, the Court disagrees with Plaintiffs and finds that Shiftsmart has standing to move to compel arbitration.

As a preliminary matter, the parties dispute which body of law governs the question of whether Shiftsmart has standing. Each of the PSAs at issue includes a governing law provision. For example, the September 22, 2021, PSA, and all preceding PSAs Shiftsmart has submitted, provide that, "[t]his Agreement or any claim, cause of action, dispute or proceeding . . . arising out of or related to this Agreement shall be governed by the laws of the State of Texas." *See* ECF No.

---

[5] Having concluded that it will not entertain Dynata's "motion" to compel arbitration, the Court denies as moot Shiftsmart's motion to strike a notice of supplemental authority, ECF No. 104, which pertains to a non-signatory defendant employer's ability to enforce an arbitration agreement between a third-party staffing agency and plaintiffs.

82-8, at 13 § 15.1.  Similarly, the August 5, 2022, October 21, 2022, and December 6, 2022, PSAs provide:  "With the exception of the Arbitration Provision set forth in Section 15 . . . , which shall be governed by the law set forth therein, the validity, performance and construction of this Agreement shall be governed by the laws of the State of Texas."  *See* ECF No. 82-11, at 12 § 14.7. The arbitration provisions in these PSAs provide that the FAA applies to the arbitration provisions, *see id.* § 15, and that, "[i]f a court determines the [FAA] does not apply to a particular dispute or to one or both parties, the parties agree that the laws of the State of Texas apply," *id.* at 15 § 15.

In its briefing regarding the application of section 4 of the FAA, Shiftsmart generally cites Second Circuit case law.  Plaintiffs, on the other hand, cite to case law from the Fifth Circuit, the federal circuit in which Texas is located.  Plaintiffs do not, however, point to any authority suggesting that, where a choice of law provision in an agreement mandates the application of a certain *state's* law with respect to claims arising out of the agreement, the choice of law provision likewise dictates which law the court applies when interpreting and applying a *federal* statute.  To the contrary, courts in this Circuit have held that contract provisions mandating the application of a certain state's law do not govern the court's interpretation of a federal statute.  *See Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 239 F. Supp. 2d 322, 328 (S.D.N.Y. 2002) (where choice of law provision in agreement required application of New Jersey law, finding that there was "[n]o choice of law problem" with respect to the interpretation of a defense to a fraud claim under a federal statute because "state law plays no role in the interpretation of that federal statute"); *Wm. S. Newman Brewing Co. v. C. Schmidt & Sons, Inc.*, 115 B.R. 25, 28 (N.D.N.Y. 1990) (rejecting the argument that a choice of law provision mandating the application of Pennsylvania law required the court to apply Third Circuit case law, and stating:  "[T]he issue presented here pertains to the interpretation of bankruptcy law in conjunction with other federal statutes.  The parties' choice of

state law does not govern the federal questions presented here.").  Accordingly, the Court will apply the law of the Second Circuit in interpreting the FAA.

Turning to the law of the Second Circuit on this issue, the Court finds that Shiftsmart is an aggrieved party under Section 4 of the FAA and, therefore, has standing to seek arbitration.[6]  In determining whether a party has standing to seek arbitration, Section 4 of the of the FAA "impose[s] no limits on jurisdiction beyond those already imposed by basic Article III principles of standing."  *See Phoenix Aktiengesellschaft v. Ecoplas, Inc.*, 391 F.3d 433, 437 (2d Cir. 2004) (discussing district court's observations in *Hartford Accident & Indem. Co. v. Equitas Reins. Ltd.*, 200 F. Supp. 2d 102 (D. Conn. 2002)).  The doctrine of standing is "rooted in the traditional understanding of a case or controversy" and serves to "ensure that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  To establish Article III standing, a plaintiff must demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U. S. Bank N.A.*, 590 U.S. __, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Here, although no party's briefing addresses the Article III standing requirements in particular, Plaintiffs generally assert that Shiftsmart has not been injured—or "aggrieved"— because Plaintiffs have asserted no claims against Shiftsmart.  In support of this assertion, Plaintiffs cite only to Fifth Circuit case law; case law in this Circuit, however, runs contrary to Plaintiffs' argument.  In *Doctor's Associates, Inc. v. El Turk*, No. 3:17-CV-2019 (JCH), 2018 WL

---

[6] Initially, the Court notes that "[t]he question of a party's standing to seek arbitration must be determined by the Court and cannot be left to the arbitrator."  *Conn. Lab. Rels. Div. of New England Rd. Builders Ass'n v. Hoisting & Portable Eng'rs Loc. 478 of Int'l Union of Operating Eng'rs, AFL-CIO*, 285 F. Supp. 311, 316 (D. Conn. 1968).

3238701, at *4 (D. Conn. Feb. 28, 2018), the court found that, "under the FAA, a party may be 'aggrieved' such that the injury requirement for standing is satisfied even if they are not a party to the underlying litigation."  Other courts in this Circuit have arrived at similar conclusions.  *See Doctor's Assocs., Inc. v. Hollingsworth*, 949 F. Supp. 77, 83 (D. Conn. 1996); *see also McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1106 (2d Cir. 1990) (finding that "the absence of a request for relief" against a party to an arbitration agreement with the plaintiffs, did not "determine whether a controversy exist[ed]" between that party and the plaintiffs).[7]  Accordingly, the Court rejects Plaintiffs' argument that Shiftsmart can only be considered an aggrieved party if Plaintiff asserts claims against it.

The Court next finds that Shiftsmart has plausibly alleged an injury in fact for purposes of the first prong of the Court's standing inquiry.  Specifically, Shiftsmart asserts that Plaintiffs' refusal to arbitrate their claims violates the arbitration provisions of the PSAs.  Other courts in this Circuit have found such allegations sufficient to satisfy the "injury in fact" requirement of Article III standing.  *See El Turk*, 2018 WL 3238701, at *4 (where franchisor was not a party to underlying litigation, finding that "an alleged violation of the arbitration agreement violates [the franchisor's] rights under the Franchise Agreement and the FAA, which satisfies the 'injury in fact' requirement"); *Hollingsworth*, 949 F. Supp. at 83 (holding that franchisees' refusal to arbitrate rendered franchisor an aggrieved party entitled to petition to compel arbitration).  Moreover, in this case, Shiftsmart has now been sued as a third-party defendant, and Dynata is seeking indemnification from Shiftsmart with respect to Plaintiffs' claims.  *See generally* ECF No. 67.

---

[7] In addition, as the district court noted in *Hollingsworth*, "the Second Circuit has refused to allow parties to an arbitration agreement to evade arbitration through artful pleading."  949 F. Supp. at 83 (citing *McCowan*, 908 F.2d at 1106).  Here, it is unclear why Plaintiffs chose to sue Dynata only but did not choose to sue Shiftsmart.  In any event, for the reasons stated above, Plaintiffs' decision to name as a defendant only a party that is *not* a party to the PSAs does not altogether bar enforcement of the arbitration provisions in the PSAs.

Shiftsmart's potential losses are thus not merely theoretical; if Dynata is liable to Plaintiffs, Shiftsmart may itself be liable to Dynata.

The Court has no difficulty finding that Shiftsmart has also satisfied the second and third prongs of Article III standing.  There is "little question" that Plaintiffs' refusal to arbitrate, having satisfied injury in fact, "satisfies the 'causal connection' requirement" as well.  *El Turk*, 2018 WL 3238701, at *4 (citing *Lujan*, 504 U.S. at 560).  It is also plain that Shiftsmart's alleged injury is "redressable" by an order from this Court compelling arbitration.  *Id.*  Accordingly, the Court finds that Shiftsmart has standing to seek arbitration of Plaintiffs' claims in this action.

### C.  Whether the Arbitration Agreements Mandate Arbitration

The Court will next address the merits of Shiftsmart's motion to compel arbitration.  As noted above, Shiftsmart has submitted several PSAs that it claims have bound different Plaintiffs at various times.  The parties do not dispute that opt-in Plaintiffs Margaret Samantha Abernathy, Yolanda Davis, Keshun Durden, Brittni Davis, and Tiara Jones have entered pre-litigation PSAs, or that opt-in Plaintiffs Sasha Watson, Catera Dunan, Toya Shaunnell Kenan, Alisa Charles, and named Plaintiffs Teneshia Bankston, and Tiffany Taylor have entered post-litigation PSAs.  ECF No. 82-1 at 9.

Plaintiffs assert that the arbitration provisions of the pre-litigation PSAs do not apply to their claims against Dynata because Dynata was neither a party nor a third-party beneficiary under these agreements, and because Shiftsmart has not provided any other valid basis for requiring Plaintiffs to arbitrate their claims against Dynata, a non-signatory of the PSAs.  For the reasons explained below, the Court finds that the arbitration provisions in the pre-litigation PSAs do not apply to Plaintiffs' claims against Dynata.  Therefore, Plaintiffs who entered into this set of PSAs need not arbitrate their claims against Dynata.

15

The arbitration provisions of the post-litigation PSAs, however, are a different matter. Plaintiffs assert that their arbitration provisions are unenforceable because they constitute an improper attempt by Dynata and Shiftsmart to trick Plaintiffs into waiving their rights to participate in this litigation, and because the arbitration provisions fail for lack of notice, consideration, and mutuality. In addition, Plaintiffs challenge the post-litigation PSAs in their entirety on the grounds that they are indefinite and illusory, and are the product of fraud or duress. As set forth below, the Court rejects Plaintiffs' arguments regarding the validity of the arbitration provisions in these PSAs. Those provisions are valid and enforceable. But the question of whether the PSAs, as a whole, are valid contracts must be decided by the arbitrator.

### 1.   Pre-Litigation PSAs

The Court begins by finding that named and opt-in Plaintiffs who entered arbitration provisions in the PSAs predating October 21, 2022, need not arbitrate their claims against Dynata. Shiftsmart raises three arguments in support of its assertion that these PSAs bind Plaintiffs to arbitrate their claims against Dynata: first, that Plaintiffs' claims fall within the scope of the broad language in the arbitration provisions of the PSAs; second, that Dynata has consented to arbitration; and, third, that Plaintiffs should be prevented from avoiding arbitration under a theory of equitable estoppel. For the reasons explained below, Shiftsmart's arguments are unavailing.

Each of the pre-litigation PSAs includes a governing law provision mandating the application of Texas law.[8]  Under Texas law, "[a]rbitration is . . . governed by two fundamental

---

[8] The arbitration provision of the August 6, 2022, PSA mandates the application of the FAA, and provides that, "[i]f a court determines the [FAA] does not apply to a particular dispute or to one or both parties, the parties agree that the laws of the State of Texas apply." ECF No. 82-9 at 15 § 15. Notwithstanding the application of the FAA, however, the question of whether an agreement to arbitrate was formed is governed by state-law principles of contract formation. *Starke*, 913 F.3d at 288; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) ("While the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'" (internal citations omitted)). Accordingly, the Court applies both Texas state law and the fundamental rules of the FAA to the question of whether the pre-litigation PSAs require Plaintiffs to arbitrate their claims against Dynata.

principles: arbitration agreements are contracts that must be enforced according to their terms, and a party cannot be compelled to arbitrate any dispute absent an agreement to do so." *Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 525 (Tex. 2019); *see Am. Allied Sec., Inc. v. Am. Gen. Sec., Inc.*, No. 14-99-01082-CV, 2000 WL 1357209, at *3 (Tex. App. Ct. Sept. 21, 2000) ("The general rule is that a party cannot be compelled to submit a dispute to arbitration unless there is a contractual agreement to do so."). Thus, Texas courts recognize that, "[s]ince an arbitration agreement is a contract matter, it generally binds only signatories to that agreement." *Sabine Syngas, Ltd. v. Port of Port Arthur Nav. Dist. of Jefferson Cnty., Tex.*, No. 09-09-00331-CV, 2011 WL 192756, at *3 (Tex. App. Jan. 13, 2011).

Here, Shiftsmart provides no basis under Texas law for requiring the Plaintiffs subject to pre-litigation PSAs to arbitrate their claims against Dynata. First, Shiftsmart offers no support in case law for the proposition that Plaintiffs must arbitrate their claims against Dynata simply because *Dynata* has consented to arbitration or because Plaintiffs' claims purportedly fall within the broad language of the arbitration provisions in the pre-litigation PSAs.

In fact, the pre-litigation PSAs strongly suggest that Shiftsmart and Plaintiffs' agreement to arbitrate would not extend to claims against a non-signatory such as Dynata. The pre-litigation PSAs expressly preclude "third party beneficiaries" and state that the agreement does not create "any third-party beneficiary claims." ECF Nos. 82-4–82-9 § 14.6. This provision demonstrates that the parties to the pre-litigation PSAs—Shiftsmart and some Plaintiffs—did not intend to give Dynata the ability to enforce the arbitration agreement. *See MCI Telecommc'ns, Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) ("The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied."). It follows that Shiftsmart, which has not itself been sued by Plaintiffs, cannot enforce

the arbitration agreement in a manner that would be consistent with conferring upon Dynata the benefits of third-party beneficiary status.  To read the pre-litigation PSAs as Shiftsmart suggests would be to effectively read out the clause explicitly prohibiting third-party beneficiaries.

Indeed, Shiftsmart replaced this provision after the start of this litigation, and instead introduced one which clearly states that "this Arbitration Provision applies to any dispute that Shiftsmart may have against you *or that you may have against Shiftsmart, an Affiliate*, or User." ECF No. 82-10 at 15 (emphasis added).  "Affiliates," in turn, are defined to include Shiftsmart's customers, such as Dynata here.  While Shiftsmart takes the position that even the pre-litigation PSAs' language would require Plaintiffs to arbitrate their claims against Dynata, the October 2022 shift toward language that expressly requires arbitration of claims brought against Shiftsmart's Affiliates strongly suggests that the parties did not intend for the pre-litigation PSAs' language to require arbitration of such claims, particularly when it is read in conjunction with the clause forbidding third-party beneficiaries.

Shiftsmart's estoppel argument—which it makes only in passing in its reply—also fails. First, in making this argument, Shiftsmart relies only on Second Circuit and Fifth Circuit case law. ECF No. 98 at 7.  Specifically, Shiftsmart argues that Plaintiffs' arguments conflict with the equitable estoppel principle that a "signatory may be compelled to arbitrate claims against a non-signatory" where "'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"  *Id.* at 7 (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005), and citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)).  "[W]hen the parties have agreed to arbitrate in a contract that expressly selects the law of a given jurisdiction," however, "that choice-of-law clause governs the question of who has agreed to arbitrate."  *Andreoli v. Comcast Cable Commc'ns Mgmt., LLC*, No.

3:19-CV-00954 (JAM), 2020 WL 1242919, at *4 (D. Conn. Mar. 16, 2020) (discussing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 49–51 (2d Cir. 2004)).   Accordingly, the Court looks to equitable estoppel principles under Texas state law.

Under Texas law, Shiftsmart's equitable estoppel arguments do not hold water.   At the outset, "[i]ntertwined claims estoppel has been referenced by several Texas courts, but has never been adopted by the Texas Supreme Court."   *Ashby v. Kern*, No. 05-20-00985-CV, 2021 WL 2963750, at *9 (Tex. App. Ct. July 14, 2021), *review denied* (June 23, 2023).   The Court therefore declines to apply it here.   By contrast, Texas courts do recognize a "direct benefits" estoppel theory, under which a claimant who brings a claim that seeks "direct benefits" under a contract containing an arbitration agreement cannot "deny arbitration's applicability because the defendant is a non-signatory."   *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 527 (Tex. 2015) (quoting *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 306 (Tex. 2006); *see also Meyer*, 211 S.W.3d at 305 (recognizing that one who "seeks by his claim to derive a direct benefit from the contract containing the arbitration provision may be equitably estopped from refusing arbitration") (internal quotation marks omitted).   Under this theory, however, "[i]t is not enough . . . that the party's claim 'relates to' the contract that contains the arbitration agreement."   *Id.*   Rather, the plaintiff's claim must "depend on the existence" of the contract and "be unable to 'stand independently' without the contract"; the defendant's alleged liability must also "arise solely from the contract or must be determined by reference to it."   *G.T. Leach Builders, LLC*, 458 S.W.3d at 527–28 (cleaned up).   Thus, "'when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law,' rather than from the contract, 'direct benefits' estoppel does not apply, even if the claim refers to or

relates to the contract." *Id.* at 528 (quoting *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 184 n.2 (Tex. 2009)).

Here, Plaintiffs' claims arise from general obligations imposed by federal and state law, including the FLSA, state wage and hour statutes, and the state tort of unjust enrichment. While Plaintiffs have alleged a breach of contract claim against Dynata, it is not based on a breach of the PSA. And, indeed, Dynata, in its motion to dismiss Plaintiffs' breach of contract claim, has disclaimed that *any* contract exists between it and Plaintiffs. Thus, Dynata's purported liability does not arise *solely* from Plaintiffs' PSAs with Shiftsmart; nor must Dynata's purported liability be determined by reference to the PSAs. Direct benefits estoppel therefore does not apply. *See Flynn v. Sanchez Oil & Gas Corp.*, No. SA-19-CV-00867-JKP, 2019 WL 6606530, at *6 (W.D. Tex. Dec. 5, 2019) ("Flynn's FLSA claims against Sanchez 'relate to the contract' with Cypress-TIR but do not arise from it.").

For these reasons, Shiftsmart has failed to identify any principle under Texas law that would permit this Court to bind Plaintiffs to arbitrate their claims against Dynata based on the pre-litigation PSAs. Accordingly, Shiftsmart's motion is denied to the extent it seeks to compel arbitration based on PSAs that predated the October 21, 2022, PSA.

### 2. *Post-Litigation PSAs*

The post-litigation PSAs were introduced on October 21, 2022, ECF No. 82-10, and December 6, 2022, ECF No. 82-11. Plaintiffs challenge the applicability of these PSAs to their claims on several grounds. First, they claim that the arbitration provisions in both PSAs should not be enforced because Dynata and Shiftsmart improperly colluded to introduce the PSAs after the start of this litigation, and because the arbitration provisions fail for lack of notice. Next, Plaintiffs claim that both PSAs are invalid in their entirety because they are illusory and were

20

allegedly procured by fraud or duress.  Finally, Plaintiffs claim that the arbitration provision in the December 6, 2022, PSA is invalid for lack of consideration and mutuality, and that the December 6, 2022, PSA is invalid in its entirety because it fails for indefiniteness.

As a preliminary matter, the Supreme Court has divided challenges to the validity of arbitration agreements into two categories:  first, parties may challenge the validity of the *agreement to arbitrate*, specifically; and second, parties may raise broader challenges to the "contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."  *Buckeye Check Cashing,* 546 U.S. at 444. Recognizing arbitration provisions as severable from the remainder of the contracts in which they reside, the Supreme Court has held that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."  *Id.* at 445–46. Thus, while a court can address challenges specifically to the validity of agreements to arbitrate, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."  *Id.* at 449.

Here, Plaintiffs challenge both the validity of the arbitration provisions in the October 21, 2022, and December 6, 2022, PSAs, and the validity of each of those PSAs in its entirety.  The Court interprets the following arguments of Plaintiffs to be challenges to the arbitration provisions in the PSAs, specifically:  (1) Dynata and Shiftsmart improperly colluded to introduce the PSAs and induce Shiftsmart Partners into waiving their rights to participate in this action; (2) the arbitration provisions in both PSAs should fail for lack of notice; (3) the post-litigation PSAs' arbitration provisions are illusory; and (4) the arbitration provision in the December 6, 2022, PSA should fail for lack of consideration and mutuality.  Accordingly, the Court can properly address

these challenges.  By contrast, to the extent Plaintiffs assert that the post-litigation PSAs as a whole are the result of fraud or duress, and that the December 6, 2022, PSA fails for indefiniteness, these are challenges to the validity of the PSAs in their entirety.  As the Court finds the arbitration provisions in the PSAs to be valid, these additional issues must be decided by the arbitrator.

The Court will address each of Plaintiffs' arguments regarding the validity of the arbitration provisions in turn.

a.  Whether the Court Should Decline to Enforce PSA Modifications Introduced During the Pendency of this Litigation

Plaintiffs argue that the arbitration provisions in the October 21, 2022, and December 6, 2022, PSAs should not be enforced with respect to the claims in this lawsuit because these provisions constituted a "concerted, intentional effort to usurp the Court's supervisory authority over the class and are an otherwise misleading and improper communication with the putative class members and Plaintiffs."  ECF No. 95 at 19–20.  In support of this argument, Plaintiffs cite case law providing that, "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."  *OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 600 (S.D.N.Y. 2020) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).  In response, Defendant argues that, at the time that the October 21, 2022, and December 6, 2022, PSAs were introduced, Shiftsmart was not a party to this litigation.  This argument has gone unanswered, as Plaintiffs offer no case law providing that the Court may invalidate or refuse to enforce arbitration agreements entered into by putative class or collective members and a *non-party* during the course of litigation with a different party.

More fundamentally, Plaintiffs do not make the showing of unconscionability necessary before a court may decline to enforce an agreement to arbitrate. *OConner*, 444 F. Supp. 3d at 602. This case does not involve "the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Mitsubishi Motors Corp v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985). By Plaintiffs' own admission, they were asked to "accept" the new terms before they could access the Shiftsmart application. ECF No. 95 at 22. These types of "clickwrap" agreements are enforceable under Texas law. *See Klebba v. Netgear, Inc.*, No. 1:18-cv-438 (RP), 2019 WL 453364, at *4–5 (W.D. Tex. Feb. 5, 2019). Plaintiffs themselves acknowledge that they could have read the new contract—and opted not to accept it—had they logged onto the app early. ECF No. 95 at 22. And the consequence of being late for the shift in order to read the agreement is not so coercive as to require invalidation of it. Additionally, named Plaintiff Taylor and opt-in Plaintiffs Watson and Charles have specifically attested that they accepted the terms on December 7, 2022, *after their employment ended*, so that they could log into Shiftsmart to view their pay statements. Taylor Decl., ECF No. 95-1 ¶¶ 5–6; Watson Decl., ECF No. 95-2 ¶¶ 4–5; Charles Decl., ECF No. 95-3 ¶¶ 4–5. They were therefore not required to agree to arbitration to continue employment. In any event, the new arbitration provision was first debuted as part of the October 21, 2022, PSA, so they were already bound by it as of that date, and their argument that they were somehow forced into an agreement to arbitrate in December simply to view pay statements is unconvincing.

This case is distinguishable from *OConner*, 444 F. Supp. 3d at 598, on which Plaintiffs rely heavily. There, the *defendant* coerced the plaintiffs, who had not previously been subject to arbitration, to sign new arbitration agreements within two days as a condition of continued employment, for the very purpose of depriving the plaintiffs the opportunity to participate in the

ongoing litigation.  *Id.*  The defendant's litigation counsel in *OConner* was "intimately involved" in the rollout of the new arbitration agreements.  *Id.*  Here, by contrast, Plaintiffs have presented no evidence that Dynata, the sole defendant in this action, (or its counsel) somehow misled Plaintiffs into agreeing to the modifications to the Shiftsmart arbitration agreement presented in the October 2022 or December 2022 PSAs in order to preclude Plaintiffs' participation in this litigation.  Indeed, Dynata has represented that it did not coordinate with Shiftsmart about the changes, which is corroborated by Dynata's late request to join Shiftsmart's motion to compel arbitration; had Dynata and Shiftsmart truly been working hand-in-hand all along to induce Plaintiffs into a more comprehensive arbitration agreement that covered their claims against Dynata, Dynata presumably would have moved quickly to compel arbitration once the modified agreement took effect.  As explained above, it did not do so.

In sum, the Court finds that neither Dynata nor Shiftsmart—a non-party to the litigation at the relevant time—engaged in fraudulent or overly coercive behavior that would warrant declining to enforce Shiftsmart's arbitration agreement with Plaintiffs.  The Court also holds that Dynata's and Shiftsmart's behavior did not usurp its authority to manage this action.

        b.      Whether the Arbitration Provisions in the Post-Litigation PSAs Fail for Lack of Notice

The Court next rejects Plaintiffs' arguments that the arbitration provisions fail for lack of notice.  Plaintiffs acknowledge they were required to accept the new arbitration provisions before continuing to use Shiftsmart.  ECF No. 95 at 22.  Intuitively, modifications which "require the user to . . . indicate his or her assent by clicking '[a]ccept'" are enforceable.  *See In re Online Travel Co.*, 953 F. Supp. 2d 713, 720 (N.D. Tex. 2013).  Here, although Plaintiffs claim they were rushed and could not read the agreements before their shifts started, they certainly could have taken the

time to review them.  The elements of notice and acceptance of the modified terms are present here.[9]

           c.      Whether the Arbitration Provisions in the Post-Litigation PSAs Are Illusory[10]

In arguing that the post-litigation PSAs' arbitration provisions are illusory, Plaintiffs chiefly take issue with Shiftsmart's "supplemental terms" provision, whereby Shiftsmart states "[y]ou may be presented with certain Supplemental Terms from time to time [which] are in addition to, and shall be deemed part of, this Agreement."  ECF No. 82-10 at 14.  Plaintiffs contend that the arbitration provisions are illusory because Shiftsmart can alter the terms of the arbitration agreement at any time, and Plaintiffs lack a similar opportunity.  The Court disagrees.  *Torres v. S.G.E. Management, L.L.C.*, 397 F. App'x 63, 68 (5th Cir. 2010) (unpublished), the sole case on which Plaintiffs rely, is distinguishable because, there, the party seeking to enforce the arbitration agreement could unilaterally renege on its promise to arbitrate "by merely posting an amendment to the agreement on its website," without requiring assent of the other party to the agreement.  Here, by contrast, the PSAs provide that any modifications are binding "only upon [Plaintiffs'] acceptance of the modified agreement."  *See, e.g.*, ECF No. 82-10 at 14, § 14.1; ECF No. 82-11 at 11, § 14.1.  Plaintiffs had to affirmatively *accept* the terms of the new PSAs when presented with them in the Shiftsmart app, and in fact, did affirmatively accept the terms.  The arbitration agreements in the post-litigation PSAs are therefore not illusory.

---

[9] *Gezu v. Charter Communications*, 17 F.4th 547, 553 (5th Cir. 2021), and the cases it cites are inapposite because they involved at-will employees who were not initially subject to an arbitration agreement.  Here, by contrast, Plaintiffs accepted the terms of the PSAs, including their arbitration provisions, before accepting shifts through Shiftsmart.

[10] Plaintiffs' opposition briefing contains a heading entitled "Illusory Contract and Lack of Mutual Assent."  ECF No. 95 at 29.  In this section, Plaintiffs argue that the arbitration provisions in the post-litigation PSAs are illusory, but do not further mention lack of mutual assent.  The Court therefore does not separately address lack of mutual assent.

          d.       Whether the Arbitration Provision in the December 6, 2022,
                       PSA Fails for Lack of Consideration and Mutuality

The Court next rejects Plaintiffs' argument that the arbitration provision in the December

6, 2022, PSA fails for lack of consideration and mutuality. *See In re Palm Harbor Homes, Inc.*,

195 S.W.3d 672, 676 (Tex. 2006) ("Arbitration agreements, like other contracts, must be supported

by consideration. Such consideration may take the form of bilateral promises to arbitrate. Further,

when an arbitration clause is part of a larger, underlying contract, the remainder of the contract

may suffice as consideration for the arbitration clause." (internal citations omitted)); *see also Perez*

*v. Lemarroy*, 592 F. Supp. 2d 924, 932 (S.D. Tex. 2008) ("Mutuality of obligation is unnecessary

to enforce an arbitration provision so long as the underlying contract is supported by adequate

consideration. Where the arbitration clause is one part of a contract, the rest of the agreement

provides the consideration." (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001),

and *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005)). Here, both Plaintiffs and

Shiftsmart have committed to arbitrate, so the December 6, 2022, PSA does not fail for lack of

consideration or mutuality.

          e.       What Remains for the Arbitrator

Having found that the arbitration provision is valid and enforceable, Plaintiffs must now

make their arguments concerning the enforceability of the post-litigation PSAs as a whole, which

concern whether the agreements were the product of fraud and duress and whether the December

6, 2022, PSA fails for indefiniteness, to the arbitrator. *Buckeye Check Cashing, Inc.*, 546 U.S. at

449. *Buckeye* held that issues of contract validity, such as whether an agreement was fraudulently

induced, must be decided by the arbitrator, but left open the question of whether issues of contract

formation—such as whether a counterparty signed the contract, whether the signor lacked

authority to commit a principal to the contract, and whether the signor lacked the mental capacity to assent—should likewise be decided by the arbitrator, rather than a court. *Id.* at 444, n.1.

As *Buckeye* was not briefed by the parties, the Court gave notice that it wished to hear argument about its applicability at the oral argument on the present motion. At oral argument, Plaintiffs contended *Buckeye* does not apply here, citing to two Texas state court cases, *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182 (Tex. 2009), and *Texas La Fiesta Auto Sales, LLC v. Belk*, 349 S.W.3d 872 (Tex. App. 2011). Initially, the Court questions the relevance of the Texas Supreme and Appellate Courts' interpretation of a case from the United States Supreme Court interpreting federal arbitration law. In any event, however, neither case suggests *Buckeye* is inapplicable here. First, *In re Morgan Stanley & Co.* held that the defense of mental incapacity should be treated as a challenge to contract formation—as opposed to an issue of contract validity—and therefore is reviewable in a court. 293 S.W.3d at 187, 190. This holding an issue *Buckeye* explicitly left open. *See* 546 U.S. at 444, n.1. Here, by contrast, Plaintiffs argue that the post-litigation PSAs are the result of fraud or duress, and that the December 6, 2022, PSA fails for indefiniteness. Whether the contracts are a product of fraud or duress is explicitly one of the circumstances the arbitrator must decide under *Buckeye*. 546 U.S. at 444. And whether the December 6, 2022, PSA fails for indefiniteness is a challenge to the validity of the contract as a whole, not a challenge to contract formation. *In re Morgan Stanley* therefore does not undermine the Court's holding here. Likewise, *Texas La Fiesta Auto Sales, LLC* cuts against Plaintiffs' position because there, the court only considered whether the arbitration agreement, not other parts of the contract, was properly formed. 349 S.W.3d at 879–80. That is precisely what this Court has done here.

In sum, Plaintiffs who are subject to the post-litigation PSAs—named Plaintiffs Teneshia Bankston and Tiffany Taylor and opt-in Plaintiffs Sasha Watson, Catera Dunan, Toya Shaunnell Kenan, and Alisa Charles—must arbitrate their claims and their wholesale defenses to the validity of those PSAs.  This litigation is stayed as to those Plaintiffs.

## MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

Because the Court has granted Shiftsmart's motion to stay litigation and compel arbitration with respect to named Plaintiffs Teneshia Bankston and Tiffany Taylor, the outstanding motions proceed with Yolanda Davis as the sole named Plaintiff.  The Court turns now to her motion for conditional certification and court-approved notice of a collective action against Dynata.

For the reasons explained below, the Court finds that Plaintiff is similarly situated to, and may bring a conditionally certified collective action on behalf of, all current and former hourly Call Center Survey Agents that performed surveys for Dynata used the Shiftsmart application, reported working thirty-five hours or more for Dynata in a single week at any time from November 28, 2019 to present, and are subject to a pre-litigation PSA.[11]  CCSAs who agreed to a post-litigation PSA with an enforceable arbitration provision, are not "similarly situated" for conditional certification purposes.  The Court also does not approve Plaintiff's proposed notice or methods of distribution at this time and instead orders the parties to submit a revised joint notice to be sent to potential opt-in Plaintiffs.

---

[11] Originally, Plaintiff defined the proposed collective as:  "All current and former hourly Call Center Survey Agents (CCSAs) who worked for Dynata at any time from three [years] prior to the date this motion was filed through the date of judgment on this case."  Pls.' Mot. in Supp. of Mot. for Cond. Certif. and Ct.-Auth. Not., ECF No. 43 at 2.  In her reply, Plaintiff narrowed the proposed collective, ECF No. 72 at 5, which the Court has further narrowed in light of its ruling on the motion to compel arbitration.

I.       RELEVANT FACTUAL BACKGROUND

The following facts about the relationship between Plaintiff, Shiftsmart, and Dynata are relevant to deciding the motion for conditional certification and court-approved notice.  The Court need only consider Plaintiff's allegations for purposes of deciding the present motion.  *See Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 67–68 (E.D.N.Y. 2016) (collecting cases declining to consider evidence introduced by defendants, finding it "not appropriate at this preliminary certification stage for the Court to consider whether any of [defendants' evidence] rebuts Plaintiff's assertions" related to the merits of the claims).  But because conditional certification is a "discretionary power," *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.10 (2d Cir. 2010), and Section 216(b) does not specify otherwise, the Court will sparingly consider Dynata's evidence when it provides pertinent context without rebutting Plaintiff's assertions.

As noted above, in December of 2019, Dynata entered into a Master Services Agreement with Shiftsmart, and began conducting telephone surveys with CCSAs sourced through the Shiftsmart app soon after.  *See* Taylor Decl., Ex. 1, ECF No. 70-1 ¶ 28; Opp. to Mot. for Cond. Cert. and Ct.-Auth. Not., ECF No. 70 at 31.  Dynata estimates there is a total of 51,800 such CCSAs, meaning 51,800 individuals have joined the app and completed at least one Dynata shift on Shiftsmart thereafter.  Gniffke Decl., ECF No. 70-3 ¶ 7(d).  Of those, 1,322 have recorded working more than 35 hours for Dynata in a single week.  *Id.*  Shiftsmart and Dynata refer to individuals who conduct Dynata telephone surveys through Shiftsmart as "Shiftsmart Partners."[12]  Taylor Decl. ¶ 27.

To enable CCSAs to conduct Dynata telephone surveys, Shiftsmart provides Dynata with the individuals' account names, and Dynata then permits those account names to access to its

---

[12] Plaintiffs refer to these individuals as CCSAs.  For consistency, the Court will refer to these individuals as CCSAs.

software program, "Interviewer." Taylor Decl. ¶ 45. CCSAs sign into Interviewer and "check in" on the Shiftsmart app. Davis Decl., ECF No. 43-3 ¶ 6. Before making calls, CCSAs attend a fifteen minute "pre-shift meeting" where a Dynata employee provides instructions on how to conduct the survey. *Id.*

CCSAs are monitored by some combination of screen share and data analytics. In some instances, CCSAs will receive a message from an individual on the Shiftsmart app informing them "Dynata is monitoring and has reported the following issue: Underperforming partner." Ex. 9, ECF No. 43-9. The message also instructs the CCSA to "log out of [I]nterviewer" and "[s]tudy the One Note before your next shift." *Id.* The "One Note" refers to a website that contains materials titled "Dynata Workflows and Knowledge Base." Ex. 7, ECF No. 43-7.

In an apparent screenshot of the Shiftsmart app when CCSAs finish a shift, CCSAs are "congratulat[ed]" for "completing the following shift for Dynata" and then asked to "confirm" or "dispute" an "expected payment" of a designated wage multiplied by the number of shift hours completed.[13] *See* Ex. 8, ECF No. 43-8 at 1. After selecting "confirm," CCSAs see a Dynata logo and a "total payment amount" equal to the "expected payment amount." *See id.* at 2. Notably, the number of shift hours diverges from a CCSA's "check in" and "check out" time. *See id.* at 1 (noting a 1:00 to 6:00 p.m. shift but 12:45 p.m. "check in" and 6:17 p.m. "check out" time), 3 (noting a 5:00 to 10:00 p.m. shift but 4:55 p.m. "check in" and 10:11 p.m. "check out" time). Therefore, according to Plaintiffs, CCSAs are not paid for pre-shift and post-shift work activities.

---

[13] The Master Services Agreement contains the following language: "Shiftsmart acknowledges that the Shiftsmart Partners are being paid solely by Shiftsmart and Customer has no responsibility to pay the Shiftsmart Partners for any work performed by such Shiftsmart Partners. Shiftsmart shall be solely responsible for the payment of all compensation to all Shiftsmart Partners . . .". Ex. E, ECF No. 70-1, at 34, § 3.4. Although presumably Dynata will raise this provision as a defense on the merits to Plaintiff's claims against it, it does not weigh against granting Plaintiff's motion for conditional certification. The Court will only consider Plaintiff's allegations and, as explained below, Plaintiff has substantially alleged a factual nexus between Dynata and the FLSA violations at issue.

## II.     LEGAL STANDARD

Under the FLSA, employees may bring "collective actions," which allow them to "sue on behalf of themselves and other employees who are 'similarly situated.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 243–44 (2d Cir. 2011) (citing 29 U.S.C. § 216(b)).  The FLSA requires, however, that an employee "affirmatively consent to join a 'collective action' in order to assert a claim." *Id.* at 244; *see* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any [action under section 216(b)] unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

Courts in the Second Circuit apply a "two-step method" to determine whether an action should be certified as a collective action under the FLSA.  *Myers*, 624 F.3d at 554–55.  First, a motion for conditional certification is filed and the Court "must determine whether there are any 'similarly situated' potential plaintiffs who should receive notice of the pending action and have an opportunity to opt in."  *See Zhu v. Matsu Corp.*, 424 F. Supp. 3d 253, 263 (D. Conn. 2020) (citing *Myers*, 624 F.3d at 555).  Such notice may be sent after the Court determines that plaintiffs have made a "modest factual showing" that they and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (describing the operative question as whether the plaintiffs were "similarly situated . . . with respect to whether a FLSA violation has occurred").

Once a court has conditionally certified an FLSA collective, any similarly situated employees "may opt into the case and become plaintiffs."  *Marichal v. Attending Home Care Servs., LLC*, 432 F. Supp. 3d 271, 277 (E.D.N.Y. 2020).  No employee may become a plaintiff until he or she files a written consent on the docket. 29 U.S.C. § 216(b). This "opt-in" procedure—in contrast to Rule 23's "opt-out" procedure—is a distinct statutory requirement for an FLSA

collective.  *See Zhu*, 424 F. Supp. 3d at 262 ("Unlike a Rule 23 class action where potential class members are parties to the suit unless they affirmatively opt out, an FLSA collective action requires plaintiffs to affirmatively opt in to the suit to benefit from the judgment.").

At the second step of the certification process, the Court will, "on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555.  The action may be "de-certified" if the record reveals that the opt-in plaintiffs are not similarly situated. *Id.*  In such cases, the opt-in plaintiffs' claims may be dismissed without prejudice. *Id.*

### III.    DISCUSSION

For the reasons explained below, the Court finds that Plaintiff has made the requisite "modest factual showing" that CCSAs who reported working 35 hours or more for Dynata in a single week were "similarly situated" to her with respect to both:  (1) misclassification as independent contractors by Dynata to avoid the payment of overtime wages; and (2) Dynata's failure to compensate for actual time worked, "including time spent booting up their computers and logging into essential computer software programs and applications before their shifts, attending pre-shift meetings, and time spent troubleshooting technical difficulties."  ECF No. 43 at 2.  But CCSAs who agreed to enforceable arbitration provisions in the post-litigation CCSAs are not "similarly situated" for conditional certification purposes.  The Court therefore grants conditional certification of Plaintiff's proposed collective, save for individuals who agreed to the post-litigation PSAs, and orders changes to Plaintiff's proposed notice and methods of distribution for reasons elaborated upon below.

A.  Conditional Certification

First, Plaintiff has made a "modest factual showing" that these CCSAs were similarly situated with respect to Dynata's "common policy or plan" of misclassifying employees as independent contractors to avoid payment for overtime work.  *Myers*, 624 F.3d at 555.

To this end, Plaintiff includes an affidavit from herself and two other CCSAs declaring that they conducted surveys for Dynata using the Shiftsmart app, *see* ECF Nos. 43-3 through 43-5 ¶ 6, and a screenshot of Shiftsmart's website describing its model of "match[ing] skilled workers and companies" in contrast to a traditional employee-employer relationship, *see* Ex. 6, ECF No. 43-6. Next, Plaintiff shows CCSAs were not paid for pre- and post- shift work through affidavits, ECF Nos. 43-3 through 43-5 ¶¶ 10, 15, and screenshots with the "total payment amount" for "Dynata" equaling "wage" by shift hours, to the exclusion of pre shift and post shift time, *see* ECF No. 43-8.  Plaintiff also includes screenshots showing Dynata "monitoring" and "reporting" CCSAs as "underperforming partner[s]" and "unassign[ing]" those CCSAs for the day, *see* ECF No. 43-9, meaning they would not be paid for the remainder of their shift at Dyanta's direction, ECF Nos. 43-3 through 43-5 ¶ 11.

Taken together, this is a "modest factual showing" that Dynata would utilize CCSAs as "independent contractors" through the Shiftsmart app and pay them less than traditional employees, and is generally in line with what other Second Circuit courts have found satisfies the low evidentiary threshold.  *See Martin v. Sprint/united Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2016 WL 30334, at *13–14 (S.D.N.Y. Jan. 4, 2016) (finding Plaintiffs made a modest factual showing in independent-misclassification case based on allegations in the complaint and two Plaintiffs' affidavits); *Hernandez v. Bare Burger Dio Inc.*, No. 12 Civ. 7794(RWS), 2013 WL 3199292, at *3 (S.D.N.Y. June 25, 2013) (collecting cases and noting "courts in this circuit have routinely

granted conditional collective certification based solely on the personal observations of one plaintiff's affidavits"). Dynata does not meaningfully dispute that the members of the potential collective action were all classified as independent contractors.

Plaintiff has made this factual showing notwithstanding the novel factual setting. Unlike in several prior FLSA cases, Plaintiff here was interfacing with Defendant through a third-party app. The use of Shiftsmart complicates Plaintiff's showing of a "factual nexus" between Dynata and the alleged FLSA violation of misclassification as an independent contractor.[14] *Boice v. M+W U.S., Inc.*, 130 F. Supp. 3d 677, 693 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). But Plaintiff has still "substantially alleg[ed]" a causal relationship or "factual nexus" between Dynata and the policies Plaintiff and others were subjected to when using the app, as is required at the first stage of collective certification. *Id.* (quoting in part *Cohen v. Gerson Grp. Inc.*, 686 F. Supp. 2d 317, 326 (S.D.N.Y. 2010)). Particularly, Plaintiff has made a modest factual showing that Shiftsmart and Dynata were working in concert, including by terminating shifts if Dynata determined a CCSA was "underperforming," and providing "underperforming" workers instructions to log into Dynata's "OneNote" system to study its call and survey procedures before the next shift began. Ultimately, whether Dynata caused Plaintiffs to be misclassified is a merits question best suited for later stage in the case. Especially in this novel context, its resolution will benefit from additional discovery about the relationship between Dynata and Shiftsmart.[15]

---

[14] For example, CCSAs declare that "[i]f we attempted to obtain compensation from Defendant for the pre-shift off-the-clock work, Defendant [Dynata] would simply reject our timecard," but given that Plaintiffs would request payment on the Shiftsmart app, it is speculative whether it was Shiftsmart or Dynata "reject[ing]" the timecard. ECF Nos. 43-3 through 43-5 ¶ 10.

[15] For example, Dynata represents that it "does not dictate to Shiftsmart whether and how Shiftsmart records the hours that Shiftsmart Partners work or how much Shiftsmart pays any Shiftsmart Partner." ECF No. 70-1 ¶ 38. Dynata's level of control short of "dictat[ing]" remains to be discovered. Similarly, a single representative states: "Dynata does not maintain any OneNote system *that I am aware of*." *Id.* ¶ 32 (emphasis added). Whether such a system exists, and to what extent Plaintiffs utilized or were required to utilize it, can also be explored in discovery.

For similar reasons, Plaintiff has also made a "modest factual showing" that she was "similarly situated" to others with respect to Dynata's "common policy or plan" of not compensating CCSAs for pre- and post-shift time. *Myers*, 624 F.3d at 555. Plaintiff includes affidavits and screenshots showing total pay excluding this time. *See* ECF No. 43-8. Plaintiff also details the specific tasks CCSAs completed "off the clock," such as logging on and booting up computers to be "caller ready." ECF Nos. 43-3 through 43-5 ¶ 6. These activities mirror the facts of other FLSA call center conditional certification cases. *See, e.g.*, *Culpepper v. Bank of Am., Nat'l Ass'n*, No. 3:17-CV-00264 (VAB), 2019 WL 343253, at *10 (D. Conn. Jan. 28, 2019) (collecting cases).

Dynata's arguments that Plaintiff's affidavits are deficient in form and substance are unpersuasive. As for form, the affidavits are based on some combination of "personal knowledge," and "personal knowledge, information and belief." *See, e.g.*, ECF No. 43-3 ¶¶ 1, 28 (opening by stating the affidavit is based on "personal knowledge," and concluding by stating the affidavit is based on "personal knowledge, information, and belief"). Although this equivocation and the affidavits' boilerplate nature somewhat reduces their evidentiary weight, it does not entirely discount Plaintiff's modest factual showing of similarity at this stage. *See Valerio*, 314 F.R.D. at 70 (collecting cases).

As for substance, Dynata argues the affidavits should have included additional information about how CCSAs "supposedly know that others are subject to the same treatment," such as details about "any supposed communications" amongst themselves. ECF No. 70 at 37. But it is reasonable for Plaintiff to infer that other CCSAs using the same platform to also complete surveys for Dynata remotely are subject to the same Dynata policies. It is reasonable to assume that all CCSAs administering surveys, for instance, would be required to turn on their computers, run

system diagnostic tests to prepare for their shifts, sign into the Dynata Interviewer, confirm screen share, check in using the Shiftsmart app, and attend pre-shift meetings relating to the tasks for that shift, even if the CCSAs did not personally know of others who also conducted surveys for Dynata through Shiftsmart. *Cf. Capsolas v. Pasta Res. Inc.,* No. 10 Civ. 5595 (RJH), 2011 WL 1770827, at *3 (S.D.N.Y. May 9, 2011) (holding that a common practice across eight restaurants in different locations "support[s] a reasonable inference that there was a uniform policy across [the] restaurants, all of which share common ownership, are supervised by the same individuals, and are administered by the same company"). The nature of the remote work in which the CCSAs engaged suggests that it may be difficult to demonstrate, to a certainty, that workers who log on from various parts of the country at different times of day were subject to the same policies. But the ultimate question is whether Plaintiff "to the best of [her] knowledge, and on the basis of [her] observations," was "subjected to certain wage and hour practices" and "[her] experience is shared by members of the proposed class." *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007). Plaintiff has shown that here.

Finally, Dynata's argument that *Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 115 (2d Cir. 2013), precludes Plaintiff's "gap-time claim" is a merits question regarding whether there is an actual FLSA violation. *Lundy* held that, in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege forty hours of work in a given workweek, as well as some uncompensated time in excess of the forty hours. *Id.* at 114. Insofar as Plaintiff has narrowed the proposed collective to only include CCSAs who have reported working over thirty-five hours for Dynata in a single week, and therefore has significantly increased the likelihood that members of the opt-in collective may have been deprived of overtime wages if they worked more than forty hours a week and were not appropriately compensated, *Lundy* does not preclude

conditional certification here.  *See* ECF No. 70 at 26.  In its papers and at oral argument, Dynata does not dispute that the remaining named Plaintiff Yolanda Davis, and opt-in Plaintiff Brittni Davis, have worked more than thirty-five hours for Dynata in single week.  *See* ECF No. 70 at 18.

          B.  <u>Arbitration Agreements</u>

As explained above, the Court has held that CCSAs who accepted the terms of the post-litigation PSAs must arbitrate their claims.  Dynata therefore argues that those individuals who are subject to the post-litigation PSAs are not "similarly situated" for conditional certification purposes, and they should not receive notice of the collective action.

At the outset, the Second Circuit has not spoken directly to whether a district court would exceed its discretion were it to deny conditional certification of an FLSA collective in light of potential arbitration defenses.  Given that conditional certification is a discretionary case management tool, this is doubtful.  Here, the Court determines that excluding from the potential collective those individuals whose claims would be subject to arbitration under the Court's ruling above is appropriate.  As the U.S. Supreme Court has acknowledged, "[a] trial court can better manage a major action," such as this one involving 1,322 potential plaintiffs—some of whom agreed to arbitrate their claims—"if it ascertains the contours of the action at the outset." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171–72 (1989); *see also Myers*, 624 F.3d at 555, n.10 (citing *Hoffman-La Roche*, 493 U.S. at 169, 174).  By declining to issue notice to individuals who agreed to enforceable arbitration provisions, the Court will avoid wasting the Court's "time and resources," as well as the "confusion" and "subsequent disappointment of employees who have signed the arbitration agreement." *Lin v. Everyday Beauty Amore, Inc.*, No. 18-cv-729 (BMC), 2018 WL 6492741, at *4 (E.D.N.Y. Dec. 10, 2018); *see also Agarunova v. Stella Orton Home Care Agency, Inc.*, No. 16-CV-638, 2019 WL 1114897, at *3 (E.D.N.Y. Mar. 11, 2019) (quoting

*Lin*, 2018 WL 6492741, at \*4, and deciding to "await Second Circuit guidance on the [arbitration] issue" before issuing notice).

The Court acknowledges that some courts, including in this District, "favor[] erring on the side of being overinclusive when sending notice to potential plaintiffs" even when potential opt-in plaintiffs may be, or patently are, subject to arbitration agreements. *Headley v. Liberty Homecare Options, LLC*, No. 3:20-CV-00579 (OAW), 2022 WL 2181410, at \*7 (D. Conn. June 16, 2022) (collecting cases); *see also Barone v. LAZ Parking Ltd. LLC*, No. 3:17-CV-01545(VLB), 2019 WL 5328832, at \*3 (D. Conn. Oct. 20, 2019) ("[C]ourts within the Second Circuit have consistently refused to exclude plaintiffs from receiving notice simply because they have signed arbitration agreements."). Other courts have declined to consider arbitration defenses at *Myers* first stage when the defenses' "validity" remains "speculative." *See Guzman v. Three Amigos SJL Inc.*, 117 F. Supp. 3d 516, 526 (S.D.N.Y. 2015) (declining to consider potential arbitration defense when "defendants have not moved to compel arbitration of any of the named plaintiffs for whom they assert arbitration agreements exist").

Here, however, Shiftsmart's third-party motion to compel has inserted the question of arbitration early in this litigation, and the Court has decided that CCSAs who are subject to post-litigation arbitration agreements must arbitrate their claims. Therefore, it is "neither speculative nor premature" to take its resolution into consideration when deciding the scope of the collective. *Agaruova*, 2019 WL 1114897, at \*3 (declining to send notice to plaintiffs when defendant's "motion to compel arbitration preceded plaintiff's motion to conditional certification"). The Court does not anticipate that any arbitration-related defenses raised at the second step of the two-step inquiry would involve new, fact-intensive questions that could render the arbitration agreements invalid. *Cf. Romero v. La Revise Assocs. LLC*, 968 F. Supp. 2d 639, at 646–647 (S.D.N.Y. 2013)

(approving notice to potential plaintiffs who may have signed arbitration agreements when there existed issues of fact concerning the arbitration agreements).  For instance, Plaintiff has not argued a lack of uniformity with respect to how the CCSAs entered into the arbitration agreements or what the agreements' terms are.  Rather, the parties have already identified—and the Court has already decided the significance of—differences between the pre- and post-litigation PSAs, the introduction of new terms during the pendency of litigation, and other pertinent issues.  Because "[t]he relevant record . . . is before the Court now," "there is no benefit obtained by waiting until step two to decide this issue." *Lin*, 2018 WL 6492741, at *5.

Accordingly, the Court finds that the existence of arbitration agreements weighs against conditionally certifying the collective to include CCSAs who agreed to the post-litigation PSAs.

## C.   The Parties Must File a Joint, Revised Notice

Having found conditional certification appropriate for Plaintiff's misclassification and failure-to-compensate claims as to a narrowed proposed collective, the Court next addresses the notice to potential opt-in plaintiffs.  Although the FLSA has no provision for issuing notice, it is well established that district courts have the "power to authorize notice" and "broad discretion to craft appropriate notices in individual cases." *Bittencourt v. Ferrara Bakery & Café Inc.*, 310 F.R.D. 106, 116 (S.D.N.Y. 2015); *see Rosario v. Valentine Ave. Disc. Store, Co.*, 828 F. Supp. 2d 508, 518 (E.D.N.Y. 2011) ("Determining what constitutes sufficient notice to putative plaintiffs in a Section 216(b) collective action is a matter left to the discretion of the district courts.").  "Because the benefits of a collective action depend on employees receiving notice of its pendency 'so that they can make informed decisions about whether to participate,' district courts are encouraged to monitor the notice process and ensure that the proposed notice is 'timely, accurate, and informative.'" *Zhu*, 424 F. Supp. 3d at 267 (quoting *Hoffman-La Roche*, 493 U.S. at 170, 172).

As a preliminary matter, the Court notes that Plaintiff has submitted only one proposed notice, ECF No. 43-1, which has not been updated to reflect Plaintiffs' substantial narrowing of the proposed collective to include only CCSAs who have reported working over thirty-five hours for Dynata in a single week, ECF No. 72 at 5, nor the Court's ruling regarding inclusion of only those CCSAs who are subject to a pre-litigation PSA.  Accordingly, as noted at oral argument, the Court will order the parties to confer and to submit a revised joint notice and consent form by October 5, 2023.  The Court addresses Dynata's objections to Plaintiff's proposed notice below, and the notice must be revised accordingly.

### 1.  *"United States District Court District of Connecticut"*

The Court directs the parties to replace the current header of the proposed notice with a traditional case caption.  *See* ECF No. 70 at 33–34.  The bolded words "United States District Court District of Connecticut" do not alone resemble a "judicial endorsement of the merits of the action."  *Hoffman-La Roche Inc.*, 493 U.S. at 174.  But coupled with a failure to identify Plaintiff and statements immediately below that "[a] court authorized this notice" and "this is not a solicitation from a lawyer," the header suggests that the Court issued the notice.  Therefore, "to avoid even the appearance of judicial endorsement" or "solicitation of claims," *id.*, the parties shall propose a revised notice that aligns with the common practice of simply including a traditional case caption at the top.  *See*, *e.g.*, *Panora v. Deenora Corp.*, No. 19-CV-7267 (BMC), 2020 WL 7246439, at *4 (E.D.N.Y. Dec. 9, 2020) ("The case caption merely provides basic information about the case and is appropriately included on the Notice."); *Bertone v. HSBC USA, Inc.*, No. CV 16-6993 (JMA) (ARL), 2019 WL 13144578, at *2 (E.D.N.Y. Apr. 26, 2019) (collecting cases and noting "courts routinely approve notices which include the case caption").

## 2. *Omission of Material Information About the Lawsuit*

The Court also directs the parties to include material information about the potential plaintiffs' discovery obligations as Dynata requests. ECF No. 70 at 36. Courts in this Circuit "routinely approve requests to include information regarding potential opt-in plaintiffs' discovery obligations" in opt-in notices. *Knox v. John Varvatos Enters. Inc.*, 282 F. Supp. 3d 644, 666 (S.D.N.Y. 2017); *Aboah v. Fairfield Healthcare Serv.*, No. 3:20-CV-00763 (SVN), 2023 WL 2534850, at *12 (D. Conn. Mar. 16, 2023) (approving such a request). Accordingly, the parties' joint revised notice shall include "a neutral and non-technical reference to potential opt-in plaintiffs' discovery obligations." *See, e.g., Aleman-Valdivia v. Top Dog Plumbing & Heating Corp.*, No. 20-CV-421 (LDH)(MMH), 2021 WL 4502479, at *8 (E.D.N.Y. Sept. 30, 2021); *Gorzkowska v. Euro Homecare LLC*, No. 3:19-CV-01773 (VAB), 2021 WL 222349, at *7 (D. Conn. Jan. 22, 2021). The Court finds it inappropriate, however, to include a statement that potential plaintiffs may be required to travel out of state for depositions as it is speculative at this stage whether such depositions will be required for the vast majority of plaintiffs, and if so, whether remote depositions may be accommodated.

The notice also may not include language stating that potential opt-in plaintiffs may be responsible for costs and expenses if Dynata prevails. Courts in this Circuit "have found language about potential costs to be inappropriate given the remote possibility that such costs for absent class members would be other than de minimis, and the risk of an in terrorem effect that is disproportionate to the actual likelihood that costs will occur in any significant degree." *Rosario*, 828 F. Supp. 2d at 520 (cleaned up). Therefore, it will not be permitted here.

### 3.  Methods of Distribution

The Court will permit the final approved notice to be distributed to potential opt-in plaintiffs through mail and email at the start of the sixty-day opt in period, and again as a "reminder notice" thirty days into the period.  Because this means potential opt-in plaintiffs may receive up to four notices, and Plaintiff identifies no particularized reason why additional notice is necessary, the Court declines to authorize any notice through text message as well.  The Court is mindful that multiple notices "potentially could be interpreted as encouragement by the court to join the lawsuit."  *Guzelgurgenli v. Prime Time Specials, Inc.*, 883 F. Supp. 2d 340, 357 (E.D.N.Y. 2012) (citation omitted).  For this reason, the reminder notice shall also include "an upfront disclaimer that the court neither encourages nor discourages participation in the lawsuit."  *Lopes v. Heso, Inc.*, No. 16 CV 6796 (MKB)(RML), 2017 WL 4863084, at *8 (E.D.N.Y. Oct. 27, 2017) (citing *Agerbrink v. Model Serv. LLC*, No. 14 CV 7841, 2016 WL 406385 (S.D.N.Y. Feb. 2, 2016)).

**No text messages or phone calls with potential opt-in plaintiffs will be allowed.**

### 4.  Access to Contact Information

The Court acknowledges that Dynata may not presently possess contact information for CCSAs that have reported working over thirty-five hours per week for Dynata through the Shiftsmart application and are subject to a pre-litigation PSA.  But Dynata may request this information from Shiftsmart, which maintains a database containing "data regarding individuals who agree to its Terms of Service," and has cooperated with Dynata at other stages of this litigation.  ECF No. 70-3 ¶ 5.  If Shiftsmart does not cooperate, Plaintiff may issue a third-party subpoena.  *See*, *e.g.*, *Flynn v. Sanchez Oil & Gas Corp.*, No. 19-CV-00867-JKP, 2020 WL 4353180, at *1 (W.D. Tex. July 29, 2020) (enforcing third party subpoena so that "Plaintiffs can effectuate notice" of the FLSA collective action).

## MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT AND UNJUST ENRICHMENT

Finally, the Court turns to Dynata's motion to dismiss Plaintiff's breach of contract and unjust enrichment claims.  The Court denies the motion to dismiss with respect to both claims, but notes that the unjust enrichment claim is an alternative to the breach of contract claim.

## I.      RELEVANT FACTUAL BACKGROUND

The following facts are taken from Plaintiff's amended complaint and assumed to be true for the purpose of this ruling.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As explained above, CCSAs signed up for shifts to conduct surveys for Dynata through the Shiftsmart app.  According to the amended complaint and its attachments, Dynata posted jobs on its website and shifts on the Shiftsmart app, through which it allegedly promised the CCSAs "a fixed hourly rate for all hours worked."  Am. Compl., ECF No. 32 ¶ 246; *see also id.* ¶ 97; ECF No. 32-1 at 1–2 (showing job posting bearing Dynata's logo for a "virtual call center agent" in South Carolina stating "Base wage of $10/hour"); ECF No. 32 ¶ 60 (alleging Dynata requires "many" CCSAs "to sign up for available shifts [Dynata] posts within [Dynata's] operating hours using the third-party 'Shiftsmart' application").

Specifically, alongside each shift posted on Shiftsmart, Dynata allegedly notified the CCSA of the hourly rate of pay if the CCSA worked that shift.  ECF No. 32 ¶ 246.  If the shift was less desirable, Dynata would promise an increased hourly rate.  *Id.* ¶ 98.  In addition to written promises to pay through offer letters, job postings, and these shift postings, Dynata also "made contractual verbal representations and promises to pay" the CCSAs throughout their employment "for all hours worked at their specified hourly rates" in "training/coaching sessions and in the pre-shift meetings."  *Id.* ¶¶ 248–50.

The amended complaint further alleges that, "[a]fter reviewing and considering" Dynata's offer, the CCSAs "accepted" it "when they accepted the shift and performed the duties of a CCSA." *Id.* ¶ 246; *see also id.* ¶ 252. It also alleges that Dynata, which is "responsible for paying all CCSAs," *id.* ¶ 100, "breached its promises" to Plaintiff "by failing to pay for all hours worked." *Id.* ¶ 246. *See also id.* ¶ 251 (alleging that Dynata's contractual promises were "evidenced by" each pay statement issued to CCSAs). Specifically, "[d]espite Dynata's promise to pay each CCSA for all hours worked at an agreed upon hourly rate for each hour worked, [Dynata] only paid CCSAs based on their scheduled shift start and end times." *Id.* ¶ 101. In support of the allegations of breach, Plaintiff has attached various screenshots reflecting "expected payments" after completing a shift for Dynata that are lower than "payment amounts" for the same shifts. *See*, *e.g.*, ECF No. 32-2 at 1 (screenshot reflecting "expected payment" for Dynata shift of $55.30 for July 31, 2022, for 5.53 hours worked at $10 per hour) and 2 (screenshot, with Dynata logo, showing payment of $50.00, at rate of $10 per hour for 5 hours worked). Plaintiff alleges that, at all times, Dynata "knew or should have known how long it takes CCSAs to complete their off-the-clock work," and "could have properly compensated" the CCSAs, but simply "elected not to." ECF No. 32 ¶ 31.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When determining whether a complaint states a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."  *Id.*  In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

## III.   DISCUSSION

The Court finds that Plaintiff has plausibly alleged a breach of contract claim, albeit just barely.  Plaintiff has also plausibly alleged an unjust enrichment claim, in the alternative.

### A.   Plaintiff's Breach of Contract Claim

While Defendant cites to South Carolina law for the elements of a breach of contract claim, *see* ECF No. 46-1 at 8 (citing *Johnson v. Little*, 426 S.C. 423, 428 (Ct. App. 2019)), Plaintiff cites to Connecticut law.  *See* ECF No. 63 at 7 (citing *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014)).  The Court need not decide which state's law applies

at this time, as the parties agree that, under either state's law, the existence or formation of a contract is a critical element of the claim.  The parties also agree that, regardless of which state's substantive law applies, the federal pleading requirements of Rule 8 apply here.  *See* ECF No. 46-1 at 8 (discussing "federal pleading standards") and ECF No. 63 at 9–10 (same).

The Court concludes that Plaintiff has pleaded sufficient facts to allow a reasonable inference that she and Dynata formed a contract, which Dynata proceeded to breach.  First, Plaintiff has referenced alleged promises by Dynata to pay a rate of at least $10 per hour.[16]  ECF No. 32 ¶¶ 98, 246; ECF No. No. 32-1 at 1–2.  She has also alleged that Dynata made shifts available on Shiftsmart that notified the CCSA of the "hourly rate they will be paid if they work the shift."  ECF No. 32 ¶ 246.  In addition, the amended complaint alleges that Dynata representatives made oral representations concerning the fixed hourly rate Plaintiff would be paid.  *Id.* ¶¶ 248–50.  Consistent with these promises to pay a set hourly rate, the screen Plaintiff saw after completing a Dynata shift contained an "expected payment" amount calculated using a predetermined wage.  *See*, *e.g.*, ECF No. 32-2 at 1.  These allegations, though somewhat sparse, allow an inference that Dynata made a promise to pay CCSAs a certain hourly rate of pay if they performed work for Dynata.  Plaintiff also claims that she accepted Dynata's offer by accepting shifts on Shiftsmart and performing the duties of a CCSA.  *Id.* ¶ 246.

While these allegations are certainly not highly detailed, they are not simply "formulaic recitations" of the elements of a breach of contract claim or merely "legal conclusions masquerading as factual conclusion."  *Iqbal*, 556 U.S. at 678.  Rather, when all inferences are drawn in favor of Plaintiff—as is required on a motion to dismiss—they plausibly plead the existence of an agreement between Dynata and Plaintiff to perform the duties of a CCSA for a

---

[16] The Court notes that paragraph 7 of the amended complaint is ambiguous about whether Plaintiff had agreed to serve as a CCSA before being provided with the job postings or a similar position description.  ECF No. 32 ¶ 7.

fixed hourly rate.  Other courts both within and outside of this Circuit confronting somewhat similar circumstances have found that such allegations are sufficient to survive a motion to dismiss. *See Cowell v. Utopia Home Care, Inc.*, 144 F.Supp.3d 398, 405 (E.D.N.Y. 2015) (holding that allegations that a defendant offered to pay plaintiff an hourly wage, which she accepted by performing the work, and that the defendant failed to pay plaintiff for all of the time she worked were sufficient to state a breach of contract claim); *Martin v. Lowe's Cos.*, No. 5:20-CV-15 (KDB) (DCK), 2020 WL 5369074, at *4 (W.D.N.C. Sept. 8, 2020) (holding that allegations that the defendant promised to pay the plaintiff at a "pre-established (contractual) hourly rate," and that the plaintiff accepted the defendant's terms by performing the work, sufficiently alleged "a breach of [plaintiff's] version of the contract").  This conclusion is also supported by the Supreme Court's recognition that a contract of employment "may arise by the simple act of handing a job applicant a shovel and providing a workplace." *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984).  The fact that Dynata and Plaintiff may have mediated their "offer" and "acceptance" through a third-party app does not, at the pleading stage, defeat this fundamental principle.

Dynata's arguments that Plaintiff's allegations are merely conclusory and fail to support an inference that a contract was formed are unconvincing.  All that Rule 8 requires is a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Although Plaintiff's factual allegations concerning contract formation are thin, they plausibly allege a promise by Dynata to pay a certain rate in exchange for a certain amount of work Plaintiff performed.  Therefore, while Dynata is correct that a complaint must plead facts demonstrating the elements of a cause of action, Plaintiff has met that basic threshold here.

Dynata claims that the job postings on its website do not constitute offers because they merely invited individuals to apply, and that they do not evince that Plaintiff had reached an

agreement with Dynata, as opposed to Shiftsmart.  But Plaintiff does not allege that the job postings were offers of employment; rather, she references the job postings on Dynata's website, together with Dynata's posting of shifts on Shiftsmart, as evidence that Dynata promised to pay a particular rate per hours worked.  At bottom, Plaintiff alleges that Dynata "offered" or "posted" shifts with a set hourly wage on Shiftsmart (which reflected wages also promised on the job postings) and that CCSAs subsequently "accepted" such shifts through the app.  These are the makings of a contract, at least for pleading purposes.  Moreover, Plaintiff is not required to "attach to the First Amended Complaint any documents containing" promises, as Dynata contends.  *See* ECF No. 46-1 at 11.

Finally, the Court finds that Plaintiff's allegations about the terms of her alleged contract with Dynata—to be paid a specific hourly rate for work performed—are sufficiently alleged. Plaintiff need not plead the existence of any specific terms beyond the hourly wage.  *See Cowell*, 144 F. Supp.3d at 405; *Martin*, 2020 WL 5369074, at *4.  The cases cited by Dynata for the proposition that additional specificity is required are all outside the employment context.  *See, e.g.*, *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand*, 455 F. App'x 102, 104 (2d Cir. 2012) (summary order) (dismissing claim where plaintiff failed to plead the "major terms" of a multimillion-dollar contract for the sale of commercial goods); *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16 Civ. 1099 (NSR), 2017 WL 1383773, at *7–8 (S.D.N.Y. Apr. 12, 2017) (dismissing claim where plaintiff failed to plead material terms of insurance brokerage agreement).  Similarly, this case is distinguishable from *DeSilva v. North Shore-Long Island Jewish Health System Inc.*, No. 10-CV-1341 (JFB)(ETB), 2012 WL 748760 (E.D.N.Y. March 7, 2022), where a breach of contract claim was dismissed because nurses working overtime only referenced their employer's "Unpaid Work policies" and an unknown "set rate of pay" in

their complaint. *Id.* at *8.  Here, it is clear the specified hourly wage is the specific "term" upon which Plaintiff's breach of contract claim is predicated.

Of course, it is ultimately Plaintiff's burden to prove that an enforceable contract existed between her and Dynata, and that Dynata breached its terms.  Whether she will be able to make this showing remains to be seen.  At this stage, however, the Court will allow her breach of contract claim to proceed.

B.  Plaintiff's Unjust Enrichment Claim

The Court also denies Dynata's motion to dismiss Plaintiff's unjust enrichment claim, which is pleaded in the alternative to the breach of contract claim.  *See Tahirou v. New Horizon Enters. Inc.*, No. 3:20-CV-0281 (SVN), 2022 WL 596741, at *3 (D. Conn. Feb. 28, 2022) (recognizing that a plaintiff can proceed with an unjust enrichment claim as an alternative to a breach of contract claim).

As with the breach of contract claim, Dynata supplies the elements of unjust enrichment with reference to South Carolina law, while Plaintiff supplies them from Connecticut law. Dynata's argument for dismissal focuses on whether it unjustly retained the benefit of Plaintiff's services without paying for them.  *See* ECF No. 46-1 at 13.  Although framed slightly differently by both states, whether a defendant unjustly retained a plaintiff's services without proper payment is an element of both South Carolina and Connecticut unjust enrichment claims, so the Court need not decide which state's substantive law applies to the claim at this juncture.  *Compare Anthony v. Atlantic Grp., Inc.*, 909 F. Supp. 2d 455, 488 (D.S.C. 2012) (describing elements under South Carolina law), *with Liberman v. Emigrant Mortg. Co.*, 436 F. Supp. 2d 357, 366 (D. Conn. 2006) (describing elements under Connecticut law).

Plaintiff has adequately alleged that Dynata was unjustly enriched here. The crux of Plaintiff's complaint is a failure to pay wages for services. Dynata argues that, because the amended complaint acknowledges a relationship between Dynata and Shiftsmart, it cannot support an inference that Dynata did not pay *anyone* for Plaintiff's services, resulting in a windfall to Dynata. But because the amended complaint alleges that *Dynata* was responsible for paying Plaintiff, ECF No. 32 ¶ 100, and that *Dynata* allegedly did not pay Plaintiff properly, the Court can reasonably infer that Dynata was, in some manner, unjustly enriched. Plaintiff's complaint also goes a step further, alleging that not only did Dynata fail to pay Plaintiff properly, but Dynata "knew or should have known how long it takes CCSAs to complete their off-the-clock work," and simply "elected not to" compensate the CCSAs. ECF No. 32 ¶ 31. That Dynata may have paid Shiftsmart for Plaintiff's services is a defense going to the merits of the unjust enrichment claim, but is not a reason to prohibit the claim from proceeding—particularly when there are no allegations about Dynata and Shiftsmart's payment arrangement in the amended complaint. From the allegations of the amended complaint, it is reasonable to infer that the failure to pay Plaintiff wages resulted in some unjust benefit to Dynata.

Dynata also argues that it made no promise to Plaintiff that pre- and post-shift activities would be paid at a certain rate, so there is "nothing inherently inequitable about calculating their compensation based on an hourly rate times the length of their scheduled shift." ECF No. 46-1 at 14. As set forth above, however, Plaintiff has adequately pleaded an alleged promise by Dynata to pay a certain hourly rate for hours worked. If Dynata in fact did not pay what it promised, and if Plaintiff can prove the other elements of an unjust enrichment claim, such a claim could succeed. Therefore, Dynata's motion to dismiss Plaintiff's unjust enrichment claim is denied.

## **CONCLUSION**

The Court hereby DENIES Dynata's request to join Shiftsmart's motion to stay litigation and compel arbitration, ECF No. 88.  The Court GRANTS IN PART and DENIES IN PART Shiftsmart's motion, ECF No. 82.  Shiftsmart's motion is DENIED with respect to Plaintiffs who agreed to arbitration provisions in place before October 21, 2022, and is GRANTED with respect to Plaintiffs who agreed to arbitration provisions introduced thereafter.  All litigation with respect to named Plaintiffs Teneshia Bankston and Tiffany Taylor and opt-in Plaintiffs Sasha Watson, Catera Duncan, Toya Shaunnell Kenan, Alisa Charles, is STAYED.  Named Plaintiff Yolanda Davis and opt-in Plaintiffs Margaret Samantha Abernathy, Keshun Durden, Brittni Davis, and Tiara Jones may proceed with their claims in this action.

The Court GRANTS and DENIES IN PART Plaintiff's motion for conditional certification of a collective action, ECF No. 42.  The Court finds that Plaintiff has satisfied the requirements for conditional certification, save for CCSAs who agreed to enforceable arbitration provisions in the post-litigation PSAs, and orders Dynata to identify all potential members of the collective, as limited by this ruling.  The Court orders the parties to submit a revised joint notice of collective action, in conformance with this ruling, by October 5, 2023.

The Court DENIES Dynata's motion to dismiss the breach of contract and unjust enrichment claims, ECF No. 46.

Finally, the Court denies as moot Shiftsmart's motion to strike Plaintiff's notice of additional authority, ECF No. 104.

By October 10, 2023, the parties shall submit a revised Rule 26(f) report, proposing a discovery schedule for this case.

**SO ORDERED** at Hartford, Connecticut, this 25th day of September, 2023.

_/s/ Sarala V. Nagala_
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE